UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL MULLER and<br>JOHN COLANTUONI,<br><br>Defendants | ) Criminal No.  **25cr10429**<br>)<br>) Violations:<br>)<br>) <u>Counts One - Five</u>: Bribery Concerning Programs<br>) Receiving Federal Funds<br>) (18 U.S.C. § 666(a)(1)(B))<br>)<br>) <u>Count Six</u>: Bribery Concerning Programs Receiving<br>) Federal Funds<br>) (18 U.S.C. § 666(a)(2))<br>)<br>) <u>Counts Seven - Eleven</u>: Conspiracy to Commit Federal<br>) Programs Bribery<br>) (18 U.S.C. § 371)<br>)<br>) <u>Counts Twelve - Sixteen</u>: Conspiracy to Commit Honest<br>) Services Mail Fraud<br>) (18 U.S.C. § 1349)<br>)<br>) <u>Counts Seventeen - Twenty</u>: Extortion<br>) (18 U.S.C. § 1951)<br>)<br>) <u>Count Twenty-One</u>: Obstruction of Justice<br>) (18 U.S.C. § 1503(a))<br>)<br>) <u>Forfeiture Allegation</u>:<br>) (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)<br>) |

<u>INDICTMENT</u>

At all times relevant to this Indictment:

<u>General Allegations</u>

1.    Defendant MICHAEL MULLER was a resident of Millbury, Massachusetts.

2.    Defendant JOHN COLANTUONI was a resident of Westwood, Massachusetts.

3.      The Boston Public Schools ("BPS") was a department of the City of Boston, Massachusetts (the "City").

4.      In each calendar year between and including 2010 – 2021, BPS received federal grants exceeding $10,000.

5.      BPS had a fleet of more than 700 City-owned school buses.

6.      All BPS school buses were manufactured outside Massachusetts.

7.      When not on the road, BPS school buses were kept in City-owned bus yards located in Roxbury, Dorchester, and Hyde Park. A fourth yard, in Charlestown, closed in or about 2019. Each yard a/k/a shop had a large garage with multiple bays where mechanics worked on the buses, conducting preventive maintenance (oil changes, etc.) and making repairs.

8.      BPS had a contract with a company to manage the operations and maintenance of BPS's fleet of school buses (the "Transportation Company").

9.      The Transportation Company engaged in interstate commerce.

10.     MULLER was employed by the Transportation Company as the Director of Fleet and Facilities.[1] MULLER supervised approximately fifty Transportation Company employees, including the mechanics and parts clerks at each shop, two shift managers at each shop, an administrative manager, and a senior service manager.

11.     The contract between BPS and the Transportation Company described MULLER's role as "the quality contract leader of the shop," whose job was to "ensure that

---

[1] Before the Transportation Company won the BPS contract in 2013, another company ("Company A") had the contract. MULLER's job duties remained the same when his employer changed from Company A to the Transportation Company. Likewise, Vendor Three's and Vendor Four's relationships with Company A remained unchanged when the Transportation Company won the BPS contract in 2013. As used herein, the "Transportation Company" includes Company A.

BPS's fleet is safe, well-maintained and ready for service on a daily basis." From at least 2017 through December 2021, MULLER's email signature block included both the Transportation Company and BPS.

      12.     MULLER owed a fiduciary duty to both the Transportation Company and BPS.

      13.     The Transportation Company subcontracted out much of its work to vendors. For example, vendors performed overflow preventive maintenance and mechanical repairs not performed by Transportation Company mechanics, made all autobody repairs, cleaned the buses, and plowed the snow from the yards. MULLER was responsible for managing and supervising the vendors. He had authority to fire them and to increase or decrease their work.

      14.     The vendors submitted their invoices to the Transportation Company, which forwarded them to BPS without a markup. BPS paid the invoice amounts to the Transportation Company, which paid the vendors by mailing checks.

      15.     The vendors were paid out of BPS's annual transportation budget, which was funded with taxpayer money.

      16.     MULLER's last day of active employment with the Transportation Company was December 16, 2021.

      17.     Starting in or about 2014, MULLER owned a small landscaping business called Jerry's Lawn Service, LLC ("JLS").

      18.     COLANTUONI was the President and half-owner of a small construction and landscaping company in Norwood, Massachusetts ("COLANTUONI's Company"). COLANTUONI's Company was a vendor to the Transportation Company. COLANTUONI's Company performed services such as HVAC, plumbing, and electrical repairs in and to the bus yard buildings.

3

**Overview of the Bribery-Kickback Scheme**
**Between MULLER and Vendor One**

19.     Vendor One owned a small company that repaired large trucks and heavy equipment. By 2015 at the latest, the Transportation Company was Vendor One's only client. Vendor One performed mechanical repairs, preventive maintenance, and inspections on BPS school buses.

20.     Vendor One's company engaged in interstate commerce.

21.     Vendor One's company received over $5,000 in revenues under the BPS-Transportation Company contract in each year between and including 2015-2021.

22.     Vendor One did not have a contract containing protection against termination. Vendor One understood that MULLER had the authority to terminate Vendor One's business relationship with the Transportation Company at any time.

23.     From at least as early as 2015 through December 2021, MULLER solicited a stream of benefits, including cash payments and in-kind benefits, from Vendor One, which Vendor One paid to MULLER in exchange for MULLER's official action and assistance in maintaining Vendor One's business with the Transportation Company. Vendor One feared that MULLER would terminate Vendor One's business relationship with the Transportation Company if Vendor One did not pay MULLER.

**Object and Purpose of the Bribery-Kickback Scheme**
**Between MULLER and Vendor One**

24.     The object of the conspiracy and scheme to defraud was to commit federal programs bribery and honest services mail fraud. The purpose of the conspiracy and scheme to defraud was for MULLER and Vendor One to enrich themselves personally.

### Manner and Means of the Bribery-Kickback Scheme
### Between MULLER and Vendor One

25.     Among the manner and means by which MULLER, Vendor One, and

coconspirators known and unknown to the Grand Jury carried out the conspiracy and scheme to

defraud were the following:

> a.  MULLER telling Vendor One over a period of time that he wanted cash
>
>     payments and in-kind benefits from Vendor One, including a used truck, truck
>
>     parts and labor, and Vendor One's employment of MULLER's adult child
>
>     ("MULLER's Child") as a mechanic;
>
> b.  MULLER telling Vendor One to bill the Transportation Company for
>
>     MULLER's Child's work at more than twice the hourly rate Vendor One paid
>
>     MULLER's Child, so that Vendor One would benefit financially from the
>
>     arrangement; and
>
> c.  Vendor One giving MULLER the cash payments and in-kind benefits
>
>     solicited by MULLER.

### Acts in Furtherance of the Bribery-Kickback Scheme
### Between MULLER and Vendor One

26.     From at least as early as 2015 through December 2021, MULLER, Vendor One,

and coconspirators known and unknown to the Grand Jury committed and caused to be

committed the following acts, among others, in furtherance of the conspiracy and scheme to

defraud:

|     | Appx Date | Appx Amt/Value | Bribe/Kickback Paid to or for MULLER by Vendor One |
|-----|-----------|----------------|---------------------------------------------------|
| a.  | 12/08/15 | $15,000 | A 2006 Ford F-350 Lariat pickup truck |
| b.  | 01/09/16 | $6,905 | Payment to a company in Sterling, MA (the "Truck Design Company") for a new BOSS snowplow and for labor to remove an old Fisher snowplow from a pickup truck and replace it with the new snowplow |
| c.  | 02/03/17 | $1,000 | Wages paid to MULLER's Child |
| d.  | 02/10/17 | $800 | Wages paid to MULLER's Child |
| e.  | 02/17/17 | $600 | Wages paid to MULLER's Child |
| f.  | 02/24/17 | $600 | Wages paid to MULLER's Child |
| g.  | 03/03/17 | $1,000 | Wages paid to MULLER's Child |
| h.  | 03/10/17 | $1,000 | Wages paid to MULLER's Child |
| i.  | 03/17/17 | $600 | Wages paid to MULLER's Child |
| j.  | 03/21/17 | $2,000 | Check payable to JLS from Vendor One's account no. -5552 at the Village Bank |
| k.  | 03/24/17 | $1,000 | Wages paid to MULLER's Child |
| l.  | 03/31/17 | $1,000 | Wages paid to MULLER's Child |
| m.  | 04/07/17 | $1,000 | Wages paid to MULLER's Child |
| n.  | 06/27/17 | $2,500 | Cash paid to MULLER |
| o.  | 08/11/17 | $2,000 | Cash paid to MULLER |
| p.  | 11/02/17 | $2,500 | Cash paid to MULLER |
| q.  | 12/15/18 | $5,134.06 | Payment to the Truck Design Company for an EBY flatbed and for labor to install the flatbed on a pickup truck |
| r.  | 01/12/19 | $5,458.06 | Payment to the Truck Design Company for a BOSS snowplow |
| s.  | 03/29/19 | $600 | Wages paid to MULLER's Child |
| t.  | 04/05/19 | $750 | Wages paid to MULLER's Child |
| u.  | 05/17/19 | $2,927.19 | Payment to the Truck Design Company for a DumperDogg dump insert for a pickup truck |
| v.  | 09/09/19 | $2,500 | Cash paid to MULLER |
| w.  | 02/07/20 | $750 | Wages paid to MULLER's Child |
| x.  | 03/28/20 | $750 | Wages paid to MULLER's Child |
| y.  | 01/22/21 | $750 | Wages paid to MULLER's Child |
| z.  | 01/29/21 | $600 | Wages paid to MULLER's Child |
|     | **TOTAL** | **$59,724.31** | |

### Overview of the Bribery-Kickback Scheme
### Between MULLER and Vendor Two

27.     Vendor Two owned a small power-washing company. Initially Vendor Two only power-washed the outside of the BPS buses. At some point MULLER increased Vendor Two's business with the Transportation Company by asking Vendor Two to also clean the inside of the buses, and, later, by asking Vendor Two to also power-wash the bus engines.

6

28.     Vendor Two's company engaged in interstate commerce.

29.     Vendor Two's company received over $5,000 in revenues under the BPS-Transportation Company contract in each year between and including 2016-2021.

30.     Vendor Two did not have a contract containing protection against termination. Vendor Two understood that MULLER had the authority to terminate Vendor Two's business relationship with the Transportation Company at any time.

31.     From at least as early as 2016 through December 2021, MULLER solicited a stream of benefits, specifically, cash payments and one check, from Vendor Two, which Vendor Two paid to MULLER in exchange for MULLER's official action and assistance in maintaining Vendor Two's business with the Transportation Company. Vendor Two feared that MULLER would terminate Vendor Two's business relationship with the Transportation Company if Vendor Two did not pay MULLER.

### Object and Purpose of the Bribery-Kickback Scheme
### Between MULLER and Vendor Two

32.     The object of the conspiracy and scheme to defraud was to commit federal programs bribery and honest services mail fraud. The purpose of the conspiracy and scheme to defraud was for MULLER and Vendor Two to enrich themselves personally.

### Manner and Means of the Bribery-Kickback Scheme
### Between MULLER and Vendor Two

33.     Among the manner and means by which MULLER, Vendor Two, and coconspirators known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

    a.  MULLER telling Vendor Two to inflate Vendor Two's invoices to the Transportation Company by representing that Vendor Two had washed more

bus engines than Vendor Two had in fact washed;

b.  Vendor Two sending the Transportation Company inflated invoices representing that Vendor Two had washed more bus engines than Vendor Two had in fact washed;

c.  MULLER telling Vendor Two to pay MULLER a cut from the payments Vendor Two received from the Transportation Company, in cash;

d.  MULLER telling Vendor Two when the Transportation Company checks were mailed to Vendor Two's post office box, and arranging with Vendor Two when he could pick up his cut; and

e.  Vendor Two paying MULLER his cut, often at a car dealership parking lot in Hingham, Massachusetts or a rest stop off the Massachusetts Turnpike.

**Acts in Furtherance of the Bribery-Kickback Scheme**
**Between MULLER and Vendor Two**

34.    From at least 2016 through December 2021, MULLER, Vendor Two, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and scheme to defraud:

a.  On or about October 3, 2016, MULLER texted Vendor Two: "Did u get? A check was released."

b.  On or about December 8, 2016, MULLER texted Vendor Two: "What time we meeting and were? We can meet on pike at rest stop if that works. Also are u giving my whole half or half of what you have? I have today off and want to do some shopping so sooner would be great." Vendor Two replied, "Bank opens @9 am. Rest area @ Natick."

8

    c. On or about March 8, 2017, Vendor Two texted MULLER: "Check did not clear. You got $2,500 last week. $5,000 this week. $500 more next week. $8,000 total…." MULLER replied, "Just add to engine u owe for February."

    d. On or about April 5, 2017, MULLER texted Vendor Two: "Just an FYI 1 k owed amount should be 10500." Vendor Two replied, "No I gave you $4500 Last for engines. Today all I can take is 8500. See u at 930. The check was not for 18000. In march it was 17000. Half 8500."

    e. On or about October 11, 2018, Vendor Two texted MULLER: "One for washing only.. The second for insides and engines. Not sure how to do. I need two checks this time. Any ideas??" MULLER replied, "All at once anything else would look funny."

    f. On or about October 28, 2018, MULLER texted Vendor Two, "Did the eagle land?" Vendor Two replied, "Not there yesterday. Will see on Monday."

    g. Between on or about November 1, 2018, and on or about November 4, 2021, Vendor Two paid MULLER the following bribes and kickbacks totaling $162,200:

|  | Appx Date | Appx Amt | Bribe/Kickback Paid to MULLER by Vendor Two |
|---|---|---|---|
| i. | 11/01/18 | $8,500 | Check #1501 on Vendor Two's account no. -9080 at Santander Bank |
| ii. | 11/06/18 | $8,500 | Cash |
| iii. | 04/24/19 | $8,000 | Cash |
| iv. | 05/20/19 | $8,500 | Cash |
| v. | 05/21/19 | $8,000 | Cash |
| vi. | 06/25/19 | $8,500 | Cash |
| vii. | 07/22/19 | $4,500 | Cash |
| viii. | 10/18/19 | $9,000 | Cash |
| ix. | 01/28/20 | $4,200 | Cash |
| x. | 02/19/20 | $8,000 | Cash |

|       | Appx Date | Appx Amt | Bribe/Kickback Paid to MULLER by Vendor Two |
|-------|-----------|----------|---------------------------------------------|
| xi.   | 03/26/20  | $8,000   | Cash                                        |
| xii.  | 03/27/20  | $8,000   | Cash                                        |
| xiii. | 06/04/20  | $3,000   | Cash                                        |
| xiv.  | 07/29/20  | $4,000   | Cash                                        |
| xv.   | 10/15/20  | $7,500   | Cash                                        |
| xvi.  | 11/12/20  | $4,500   | Cash                                        |
| xvii. | 12/07/20  | $7,500   | Cash                                        |
| xviii.| 01/29/21  | $9,000   | Cash                                        |
| xix.  | 06/07/21  | $9,000   | Cash                                        |
| xx.   | 07/20/21  | $9,000   | Cash                                        |
| xxi.  | 07/23/21  | $9,000   | Cash                                        |
| xxii. | 11/04/21  | $8,000   | Cash                                        |
|       | **Total** | **$162,200** |                                         |

**Overview of the Bribery-Kickback Scheme**
**Between MULLER and Vendor Three**

35.     Vendor Three plowed the snow from the BPS bus yards and trucked it away, and salted and sanded the yards. Vendor Three did not remove snow from BPS bus roofs.

36.     Vendor Three's company engaged in interstate commerce.

37.     Vendor Three's company received over $5,000 in revenues under the BPS-Transportation Company contract in each year between and including 2011-2021.

38.     Vendor Three did not have a contract containing protection against termination. Vendor Three understood that MULLER had the authority to terminate Vendor Three's business relationship with the Transportation Company at any time.

39.     From at least as early as 2011 through December 2021, MULLER solicited a stream of benefits, specifically, cash payments, from Vendor Three, which Vendor Three paid to MULLER in exchange for MULLER's official action and assistance in maintaining Vendor Three's business with the Transportation Company. Vendor Three feared that MULLER would terminate Vendor Three's business relationship with the Transportation Company if Vendor

10

Three did not pay MULLER.

## Object and Purpose of the Bribery-Kickback Scheme
## Between MULLER and Vendor Three

40.     The object of the conspiracy and scheme to defraud was to commit federal

programs bribery and honest services mail fraud. The purpose of the conspiracy and scheme to

defraud was for MULLER and Vendor Three to enrich themselves personally.

## Manner and Means of the Bribery-Kickback Scheme
## Between MULLER and Vendor Three

41.     Among the manner and means by which MULLER, Vendor Three, and

coconspirators known and unknown to the Grand Jury carried out the conspiracy and scheme to

defraud were the following:

    a.   MULLER telling Vendor Three that he had hired non-Transportation

       Company workers to clear snow off BPS roofs when in fact, as MULLER and

       Vendor Three knew, the work was done primarily if not exclusively by

       Transportation Company employees;

    b.   MULLER telling Vendor Three to give him a certain amount of cash to pay

       workers he said he had hired;

    c.   Vendor Three paying MULLER cash in the amount identified by MULLER;

    d.   Vendor Three invoicing the Transportation Company the amount of money

       Vendor Three had paid MULLER in cash, or that amount plus extra that

       Vendor Three kept, falsely representing that Vendor Three had cleaned snow

       off the bus roofs;

    e.   Vendor Three receiving payment on Vendor Three's invoices, which neither

       the Transportation Company nor BPS knew were fake; and

f.  MULLER soliciting Vendor Three for, and Vendor Three paying to

MULLER, between approximately $4,000 and $5,000 cash on approximately

three occasions.

### Acts in Furtherance of the Bribery-Kickback Scheme
### Between MULLER and Vendor Three

42.     From at least as early as 2011 through December 2021, MULLER, Vendor Three,

and coconspirators known and unknown to the Grand Jury committed and caused to be

committed the following acts, among others, in furtherance of the conspiracy and scheme to

defraud:

a.  On or about August 29, 2017, MULLER texted Vendor Three, "As close to

5K as u can is appreciated. I won't bug u after this. I have town meeting

tomorrow night and need to get a mountain of crap out of my yard today or

it's 300 a day in fines." On or shortly after August 29, 2017, Vendor Three

paid MULLER approximately $5,000 cash.

b.  On or about March 8, 2018, MULLER texted Vendor Three: "can u bring 5 so

I can pay guys." Vendor Three paid MULLER $5,000 cash and then sent the

Transportation Company an invoice for $5,376, falsely claiming that he had

paid fourteen laborers $48/hour for eight hours to clean snow off the top of

BPS buses. Vendor Three kept the extra $376.

c.  Between on or about February 4, 2011, and on or about February 20, 2021,

Vendor Three submitted fake roof-cleaning invoices to the Transportation

Company in the following amounts, most or all of which Vendor Three had

given to MULLER in cash:

12

| | Invoice date | Invoice amount | False service stated on invoice |
|---|---|---|---|
| i. | 02/04/11 | $2,900 | "Removal of snow from top of buses at various locations" |
| ii. | 03/18/11 | $2,500 | Payment to 10 workers for 5 hours at $50/hr to clean snow off bus roofs |
| iii. | 03/18/11 | $3,900 | Payment to 13 workers for 6 hours at $50/hr to clean snow off bus roofs |
| iv. | 03/18/11 | $3,300 | Payment to 12 workers for 5.5 hours at $50/hr to clean snow off bus roofs |
| v. | 01/23/12 | $3,800 | "Provided laborers to remove snow from top of buses at various locations" |
| vi. | 12/20/13 | $4,896 | Payment to 17 workers for 6 hours at $48/hr to clean snow off bus roofs |
| vii. | 12/20/13 | $3,696 | Payment to 14 workers for 5.5 hrs at $48/hr to clean snow off bus roofs |
| viii. | 01/08/14 | $8,640 | Payment to 18 workers for 10 hours at $48/hr to clean snow off bus roofs |
| ix. | 01/24/14 | $4,752 | Payment to 18 workers for 5.5 hours at $48/hr to clean snow off bus roofs |
| x. | 02/07/14 | $6,912 | Payment to 16 workers for 9 hours at $48/hr to clean snow off bus roofs |
| xi. | 02/18/14 | $4,488 | Payment to 17 workers for 5.5 hours at $48/hr to clean snow off bus roofs |
| xii. | 01/25/15 | $7,344 | Payment to 17 workers for 9 hours at $48/hr to clean snow off bus roofs |
| xiii. | 01/29/15 | $7,752 | Payment to 17 workers for 9.5 hours at $48/hr to clean snow off bus roofs |
| xiv. | 02/03/15 | $6,048 | Payment to 9 workers for 14 hours at $48/hr to clean snow off bus roofs |
| xv. | 02/09/15 | $6,960 | Payment to 10 workers for 14.5 hours at $48/hr to clean snow off bus roofs |
| xvi. | 02/16/15 | $6,912 | Payment to 12 workers for 12 hours at $48/hr to clean snow off bus roofs |
| xvii. | 03/02/15 | $4,992 | Payment to 13 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xviii. | 01/25/16 | $5,808 | Payment to 22 workers for 5.5 hours at $48/hr to clean snow off bus roofs |
| xix. | 02/08/16 | $6,336 | Payment to 22 workers for 6 hours at $48/hr to clean snow off bus roofs |
| xx. | 03/23/16 | $2,592 | Payment to 9 workers for 6 hours at $48/hr to clean snow off bus roofs |
| xxi. | 01/08/17 | $5,472 | Payment to 19 workers for 6 hours at $48/hr to clean snow off bus roofs |
| xxii. | 02/10/17 | $6,480 | Payment to 15 workers for 9 hours at $48/hr to clean snow off bus roofs |
| xxiii. | 02/13/17 | $5,808 | Payment to 22 workers for 5.5 hours at $48/hr to clean snow off bus roofs |
| xxiv. | 03/15/17 | $5,376 | Payment to 16 workers for 7 hours at $48/hr to clean snow off bus roofs |
| xxv. | 12/10/17 | $5,376 | Payment to 14 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xxvi. | 01/06/18 | $5,760 | Payment to 15 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xxvii. | 03/08/18 | $5,376 | Payment to 14 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xxviii. | 03/14/18 | $5,616 | Payment to 13 workers for 9 hours at $48/hr to clean snow off bus roofs |
| xxix. | 01/21/19 | $5,376 | Payment to 14 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xxx. | 01/20/20 | $5,376 | Payment to 14 workers for 8 hours at $48/hr to clean snow off bus roofs |
| xxxi. | 12/17/20 | $5,780 | "Removed snow around buses" in Dorchester & Hyde Park yards |
| xxxii. | 02/02/21 | $5,780 | "Removed snow around buses" in Dorchester & Hyde Park yards |
| xxxiii. | 02/08/21 | $5,780 | "Removed snow around buses" in Dorchester & Hyde Park yards |
| xxxiv. | 02/10/21 | $5,780 | "Removed snow around buses" in Dorchester & Hyde Park yards |
| xxxv. | 02/20/21 | $5,780 | "Removed snow around buses" in Dorchester & Hyde Park yards |
| | **TOTAL:** | **$189,444** | |

### Overview of the Bribery-Kickback Scheme
### Between MULLER and Vendor Four

43.    Vendor Four was the President and owner of an autobody and auto repair shop.

Vendor Four performed autobody repairs and preventive maintenance on BPS buses.

44.    Vendor Four's company engaged in interstate commerce.

13

45.     Vendor Four's company received over $5,000 in revenues under the BPS-Transportation Company contract in each year between and including 2010-2021.

46.     Vendor Four did not have a contract containing protection against termination. Vendor Four understood that MULLER had the authority to terminate Vendor Four's business relationship with the Transportation Company at any time.

47.     From at least as early as 2010 through December 2021, MULLER solicited a stream of benefits, specifically, cash payments and checks, from Vendor Four, which Vendor Four paid to MULLER in exchange for MULLER's official action and assistance in maintaining Vendor Four's business with the Transportation Company. Vendor Four feared that MULLER would terminate Vendor Four's business relationship with the Transportation Company if Vendor Four did not pay MULLER.

### Object and Purpose of the Bribery-Kickback Scheme
### Between MULLER and Vendor Four

48.     The object of the conspiracy and scheme to defraud was to commit federal programs bribery and honest services mail fraud. The purpose of the conspiracy and scheme to defraud was for MULLER and Vendor Four to enrich themselves personally.

### Manner and Means of the Bribery-Kickback Scheme
### Between MULLER and Vendor Four

49.     Among the manner and means by which MULLER, Vendor Four, and coconspirators known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

    a.  MULLER telling Vendor Four to pay him a 5% kickback on all payments Vendor Four received from the Transportation Company;

    b.  Vendor Four telling Vendor Four's Chief Financial Officer ("the CFO") to

pay MULLER a 5% kickback on all payments from the Transportation

Company, and to track the payments;

c.  The CFO paying MULLER by check when Vendor Four did not have enough

cash for the payments, but telling MULLER that Vendor Four's company

would need to issue MULLER a Form 1099 for bookkeeping purposes unless

the check was made out to a business and supported by an invoice from the

business;

d.  MULLER giving the CFO invoices from JLS for services not provided, and

Vendor Four writing checks payable to JLS in the amounts of the fake

invoices; and

e.  MULLER and the CFO concealing the nature of the kickbacks by referring to

MULLER's payment pickups from the CFO's office as "meetings" or

"production meetings," and describing the fake JLS invoices as "inventory

slips" or "sales slips," in emails.

### Acts in Furtherance of the Bribery-Kickback Scheme
### Between MULLER and Vendor Four

50.     From at least as early as 2010 through December 2021, MULLER, Vendor Four,

the CFO, and coconspirators known and unknown to the Grand Jury committed and caused to be

committed the following acts, among others, in furtherance of the conspiracy and scheme to

defraud:

a.  On or about Monday, December 4, 2017, MULLER emailed the CFO,

"[D]oes tomorrow work for our meeting?" The CFO replied, "Wednesday is

better – Bring a slip for inventory listing." MULLER wrote back, "I will be

there at approx 10 a.m."

b.  On or about Wednesday, December 6, 2017, MULLER gave the CFO a fake
JLS invoice for $3,165, and the CFO gave MULLER check no. 2296 for
$3,165 payable to JLS written on the account of a realty trust that Vendor
Four owned (the "Realty Trust"), Watertown Savings Bank account no. -1753.

c.  On Monday, July 22, 2019, MULLER emailed the CFO, "Do we have a
production meeting this morning?" The CFO replied, "How about
Wednesday, bring a sales slip with you."

d.  On or about Wednesday, July 24, 2019, MULLER gave the CFO a fake JLS
invoice for $5,000, and the CFO gave MULLER check no. 2515 for $5,000
payable to JLS written on the Realty Trust's account no. -1753 at Watertown
Savings Bank.

e.  On or about February 17, 2021, MULLER gave the CFO a fake JLS invoice
for $8,000, and the CFO gave MULLER check no. 2783 for $8,000 payable to
JLS written on the Realty Trust's account no. -1753 at Watertown Savings
Bank.

f.  On or about July 7, 2021, MULLER gave the CFO a fake JLS invoice for
$9,000, and the CFO gave MULLER check no. 2860 for $9,000 payable to
JLS written on the Realty Trust's account no. -1753 at Watertown Savings
Bank.

g.  In each year between 2010 and 2021, Vendor Four paid MULLER the
following amounts in cash and checks totaling approximately $375,032.38.

16

|      | Year  | Appx Amt    |
|------|-------|-------------|
| i.   | 2010  | $5,050.00   |
| ii.  | 2011  | $19,650.00  |
| iii. | 2012  | $10,500.00  |
| iv.  | 2013  | $23,000.00  |
| v.   | 2014  | $13,487.56  |
| vi.  | 2015  | $14,904.98  |
| vii. | 2016  | $53,424.23  |
| viii.| 2017  | $46,340.61  |
| ix.  | 2018  | $35,945.00  |
| x.   | 2019  | $31,980.00  |
| xi.  | 2020  | $59,500.00  |
| xii. | 2021  | $61,250.00  |
|      | Total | $375,032.38 |

**Overview of the Bribery-Kickback Scheme**
**Between MULLER and COLANTUONI**

51.    COLANTUONI's Company became a Transportation Company vendor no later

than 2014. The Transportation Company was COLANTUONI's Company's largest customer in

2019.

52.    COLANTUONI's Company received over $5,000 under the BPS-Transportation

Company contract in 2020 and in 2021.

53.    COLANTUONI's Company did not have a contract containing protection against

termination.

54.    Between in or about the spring of 2020 through December 2021, MULLER

solicited a stream of in-kind benefits, specifically, building materials for MULLER's vacation

house in Pascoag, Rhode Island, from COLANTUONI, which COLANTUONI and

COLANTUONI's Company provided to MULLER in exchange for MULLER's official action

and assistance in maintaining and increasing COLANTUONI's Company's business with the

Transportation Company.

17

55.     COLANTUONI's Company's revenues from the Transportation Company increased significantly from 2019 to 2020, and again from 2020 to 2021. They dropped significantly in 2022, when MULLER was no longer employed by the Transportation Company.[2]

### Object and Purpose of the Bribery-Kickback Scheme
### Between MULLER and COLANTUONI

56.     The object of the conspiracy and scheme to defraud was to commit federal programs bribery and honest services mail fraud. The purpose of the conspiracy and scheme to defraud was for MULLER and COLANTUONI to enrich themselves personally.

### Manner and Means of the Bribery-Kickback Scheme
### Between MULLER and COLANTUONI

57.     Among the manner and means by which MULLER, COLANTUONI, and coconspirators known and unknown to the Grand Jury carried out the conspiracy and scheme to defraud were the following:

a.   MULLER telling COLANTUONI, shortly after the COVID pandemic began, that BPS had decided to renovate and build out the garages and offices in the BPS bus yards (the "COVID build-out project");

b.   MULLER telling COLANTUONI that the Transportation Company planned to use vendors for the COVID build-out project;

c.   MULLER telling COLANTUONI, in or about the summer of 2020, that he intended to tear down and rebuild his vacation house in Pascoag, Rhode Island, and he would need lumber for the project;

---

[2] COLANTUONI's Company's revenues from the Transportation Company were approximately $1,001,743 (43% of total revenues reported on its federal tax return) in 2019; $4,927,769 (87% of total revenues reported) in 2020; $5,038,053 (87% of total revenues reported) in 2021; and $1,067.748 (34% of total revenues reported) in 2022.

d.  COLANTUONI and MULLER reaching an agreement that COLANTUONI's
Company would pay for MULLER's lumber in exchange for MULLER
steering work on the COVID buildout project to COLANTUONI's Company;

e.  MULLER ordering building materials from a company in Uxbridge,
Massachusetts, where COLANTUONI's Company had an account (the
"Lumber Company");

f.  The Lumber Company providing the materials to MULLER after getting
COLANTUONI's approval, and then invoicing COLANTUONI's Company;

g.  COLANTUONI trying to scrub MULLER's address from the Lumber
Company's invoices in order to conceal the fact that COLANTUONI's
Company was buying the building materials for MULLER; and

h.  MULLER telling the Lumber Company that COLANTUONI was his uncle, in
order to conceal the fact that COLANTUONI's Company was a customer of
MULLER's employer.

### Acts in Furtherance of the Bribery-Kickback Scheme<br>Between MULLER and COLANTUONI

58.    From in or about the spring of 2020 through December 2021, MULLER,
COLANTUONI, and coconspirators known and unknown to the Grand Jury committed and
caused to be committed the following acts, among others, in furtherance of the conspiracy and
scheme to defraud:

a.  In or about the spring of 2020, MULLER told COLANTUONI about the
COVID build-out project and that the Transportation Company was going to
use vendors to do the work.

b.  In or about the summer of 2020, MULLER told COLANTUONI that he was planning to tear down and rebuild his vacation house in Pascoag, Rhode Island, and that he would need lumber.

c.  On or about January 25, 2021, MULLER received a $55,410.47 quote from the Lumber Company and emailed it to COLANTUONI, subject "Important."

d.  On or about January 29, 2021, MULLER texted Lumber Company Employee-1 a photo of COLANTUONI's business card and wrote: "Just spoke with me [sic] uncle and he wants it broken into 3 bills. 1. Laminated beam, floor and walls. Bill 2 trusses and roof material. Bill 3 siding and deck." Lumber Company Employee-1 emailed the text to Lumber Company Employee-2.

e.  On or about January 29, 2021, after receiving MULLER's text, Lumber Company Employee-2 emailed COLANTUONI and MULLER a quote for $36,437.72. The quote identified the delivery address and "Your Ref" as MULLER's address in Pascoag, Rhode Island.

f.  On or about January 29, 2021, COLANTUONI replied, "Thank you for providing pricing for this project, we are interested in picking this up at your facility."

g.  On or about February 3, 2021, COLANTUONI emailed the quote back to Lumber Company Employee-2, with the delivery address and "Your Ref" crossed out and highlighted in yellow. COLANTUONI wrote: "[P]lease update changes highlighted and email back for approval and we can schedule the pick up. If you need to put a job reference please use P.O. 20211921."

h. On or about February 10, 2021, after COLANTUONI received two invoices that listed Pascoag, Rhode Island as the delivery address, COLANTUONI emailed Lumber Company Employee-2: "My office received (2) sales invoices, neither are what I approved or requested. Please … revise exactly as requested asap & resend."

i. The next day, February 11, 2021, COLANTUONI emailed Lumber Company Employee-2: "Please reply and correct this asap. I DID NOT APPROVE THIS AS SENT."

j. The next day, February 12, 2021, COLANTUONI emailed Lumber Company Employee -1 and Lumber Company Employee-2, directing that the delivery address on the invoices be changed to an address in Falmouth, Massachusetts.

k. COLANTUONI's Company received eight invoices dated between February 11, 2021, and June 29, 2021, totaling $85,029.56, for building materials for MULLER's house in Pascoag, Rhode Island, and paid the invoices in checks dated between March 12, 2021, and July 6, 2021.

l. In a memo to his manager dated October 19, 2021, MULLER wrote that COLANTUONI's Company had bid $328,930 for part of the COVID build-out, whereas Vendor Three had "declined to bid," and another vendor "never followed up." In fact, neither Vendor Three nor the other vendor was asked to bid and neither had the capability to perform construction work. Vendor Three snowplowed the bus yards and the other vendor performed transportation services.

21

### COLANTUONI's Grand Jury Testimony

59.     Between April 2024 and November 2025, a federal grand jury sitting in Boston, Massachusetts conducted an investigation into possible violations of federal laws, including 18 U.S.C. § 666 (federal programs bribery), 18 U.S.C. § 371 (conspiracy to commit federal programs bribery), 18 U.S.C. § 1349 (conspiracy to commit honest services fraud), and 18 U.S.C. § 1951 (extortion).

60.     The grand jury investigated, among other things, whether MULLER had solicited or accepted bribes and kickbacks from Transportation Company vendors, including COLANTUONI's Company.

61.     On April 3, 2025, COLANTUONI testified in the grand jury.

62.     COLANTUONI was asked why his company paid for building supplies for MULLER's house in Pascoag, Rhode island. He testified as follows, in sum and substance:

      a.   COLANTUONI's Company paid for lumber for MULLER's house in Rhode Island in exchange for MULLER repairing broken equipment at COLANTUONI's Company in Norwood, Massachusetts in his spare time.

      b.   Some of the equipment had been broken for a long time and the repairs were not urgent. COLANTUONI testified, "We just – we needed everything done, and we needed it done years ago. But it never got done. So now we were just prioritizing it because it was time to get it done …."

      c.   The reason COLANTUONI asked MULLER, not someone else, to make the repairs was that MULLER was the only skilled mechanic COLANTUONI knew who was available. COLANTUONI asked everyone he knew in the industry but "got nowhere" and was "at [his] wit's end trying to find a

mechanic."

    d.  Mechanical work "isn't rocket science" and COLANTUONI could have asked any of the mechanics at the Transportation Company. But he did not ask them because he did not know any of them "and the mechanics didn't come to me to ask for anything."

    e.  Initially COLANTUONI and MULLER agreed that COLANTUONI's Company would buy $50,000 of lumber for MULLER in exchange for MULLER making $50,000 worth of equipment repairs. Later, MULLER told COLANTUONI that he needed an additional $20,000 in lumber. COLANTUONI agreed to buy the additional lumber in exchange for MULLER making an additional $20,000 in equipment repairs.

    f.  COLANTUONI decided to pay MULLER in lumber instead of money because COLANTUONI "just thought it would be a simple trade so to speak."

    g.  No records of the alleged barter exist – no contract, no emails, no timesheets, no record of which equipment needed to be repaired, no record of which equipment was repaired or when.

    h.  COLANTUONI did not tell anyone at the Transportation Company or BPS about the alleged barter with MULLER.

63.    COLANTUONI did not tell his company's outside accountant and tax preparer about the alleged barter with MULLER.

64.    COLANTUONI's Company did not issue MULLER a Form 1099 for any work performed by MULLER for COLANTUONI's Company.

23

<u>COUNT ONE</u>
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury charges:

65.    The Grand Jury alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

66.    From at least as early as 2015 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

being an agent of a local government, or any agency thereof, namely, the Boston Public Schools

("BPS"), which received, in each of the calendar years 2015 through 2021, benefits in excess of

$10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance,

and other form of federal assistance, corruptly solicited and demanded for the benefit of a

person, and accepted and agreed to accept, anything of value from any person, intending to be

influenced and rewarded in connection with any business, transaction, and series of transactions

of BPS involving anything of value of $5,000 or more; that is, by accepting a stream of benefits

from Vendor One consisting of bribes and kickbacks totaling approximately $59,724.31.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

24

## COUNT TWO
### Bribery Concerning Programs Receiving Federal Funds
### (18 U.S.C. § 666(a)(1)(B))

The Grand Jury further charges:

67.      The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

68.      From at least as early as 2016 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

### MICHAEL MULLER,

being an agent of a local government, or any agency thereof, namely, the Boston Public Schools ("BPS"), which received, in each of the calendar years 2016 through 2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more; that is, by accepting a stream of benefits from Vendor Two consisting of bribes and kickbacks totaling approximately $162,200.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

COUNT THREE
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury further charges:

69.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

70.    From at least as early as 2011 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

being an agent of a local government, or any agency thereof, namely, the Boston Public Schools

("BPS"), which received, in each of the calendar years 2011 through 2021, benefits in excess of

$10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance,

and other form of federal assistance, corruptly solicited and demanded for the benefit of a

person, and accepted and agreed to accept, anything of value from any person, intending to be

influenced and rewarded in connection with any business, transaction, and series of transactions

of BPS involving anything of value of $5,000 or more; that is, by accepting a stream of benefits

from Vendor Three consisting of bribes and kickbacks totaling approximately $189,444.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

COUNT FOUR
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury further charges:

71.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

72.    From at least as early as 2010 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

being an agent of a local government, or any agency thereof, namely, the Boston Public Schools ("BPS"), which received, in each of the calendar years 2010 through 2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more; that is, by accepting a stream of benefits from Vendor Four consisting of bribes and kickbacks totaling approximately $375,032.38.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

27

COUNT FIVE
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(1)(B))

The Grand Jury further charges:

73.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

74.    From in or about the spring of 2020 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

being an agent of a local government, or any agency thereof, namely, the Boston Public Schools ("BPS"), which received benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance in each of the calendar years 2020 and 2021, corruptly solicited and demanded for the benefit of a person, and accepted and agreed to accept, anything of value from any person, intending to be influenced and rewarded in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more; that is, accepting a stream of benefits from JOHN COLANTUONI consisting of bribes and kickbacks totaling approximately $85,029.56.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

<u>COUNT SIX</u>
Bribery Concerning Programs Receiving Federal Funds
(18 U.S.C. § 666(a)(2))

The Grand Jury further charges:

75.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

76.     From in or about the spring of 2020 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

JOHN COLANTUONI,

corruptly gave, offered, and agreed to give anything of value to any person, with intent to

influence and reward MICHAEL MULLER, an agent of a local government, or any agency

thereof, namely, the Boston Public Schools ("BPS"), in connection with any business,

transaction, and series of transactions of BPS involving anything of value of $5,000 or more,

where BPS received benefits in excess of $10,000 under a federal program involving a grant,

contract, subsidy, loan, guarantee, insurance, and other form of federal assistance in each of the

calendar years 2020 and 2021; that is, a stream of benefits consisting of bribes and kickbacks

with a total value of approximately $85,029.56.

All in violation of Title 18, United States Code, Section 666(a)(2).

## COUNT SEVEN
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

77.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this
Indictment.

78.    From at least as early as 2015 through December 2021, in the District of
Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor One and with others known and unknown to the Grand Jury, to commit
federal programs bribery, in violation of Title 18, United States Code, Section 666; that is, for
MICHAEL MULLER, being an agent of a local government or any agency thereof, namely, the
Boston Public Schools ("BPS"), which received, in each of the calendar years 2015 through
2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy,
loan, guarantee, insurance, and other form of federal assistance, to corruptly solicit, demand for
the benefit of any person, and accept and agree to accept anything of value from Vendor One,
and for Vendor One to corruptly give, offer, and agree to give anything of value for the benefit of
any person, with intent to influence and reward MICHAEL MULLER, in connection with any
business, transaction, and series of transactions of BPS involving anything of value of $5,000 or
more.

All in violation of Title 18, United States Code, Section 371.

30

<u>COUNT EIGHT</u>
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

79.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

80.     From at least as early as 2016 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor Two and with others known and unknown to the Grand Jury, to commit federal programs bribery, in violation of Title 18, United States Code, Section 666; that is, for MICHAEL MULLER, being an agent of a local government or any agency thereof, namely, the Boston Public Schools ("BPS"), which received, in each of the calendar years 2016 through 2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to corruptly solicit, demand for the benefit of any person, and accept and agree to accept anything of value from Vendor Two, and for Vendor Two to corruptly give, offer, and agree to give anything of value for the benefit of any person, with intent to influence and reward MICHAEL MULLER, in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT NINE</u>
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

81.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

82.     From at least as early as 2011 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor Three and with others known and unknown to the Grand Jury, to commit

federal programs bribery, in violation of Title 18, United States Code, Section 666; that is, for

MICHAEL MULLER, being an agent of a local government or any agency thereof, namely, the

Boston Public Schools ("BPS"), which received, in each of the calendar years 2011 through

2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy,

loan, guarantee, insurance, and other form of federal assistance, to corruptly solicit, demand for

the benefit of any person, and accept and agree to accept anything of value from Vendor Three,

and for Vendor Three to corruptly give, offer, and agree to give anything of value for the benefit

of any person, with intent to influence and reward MICHAEL MULLER, in connection with any

business, transaction, and series of transactions of BPS involving anything of value of $5,000 or

more.

All in violation of Title 18, United States Code, Section 371.

COUNT TEN
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

83.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

84.     From at least as early as 2010 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor Four and with others known and unknown to the Grand Jury, to commit federal programs bribery, in violation of Title 18, United States Code, Section 666; that is, for MICHAEL MULLER, being an agent of a local government or any agency thereof, namely, the Boston Public Schools ("BPS"), which received, in each of the calendar years 2010 through 2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to corruptly solicit, demand for the benefit of any person, and accept and agree to accept anything of value from Vendor Four, and for Vendor Four to corruptly give, offer, and agree to give anything of value for the benefit of any person, with intent to influence and reward MICHAEL MULLER, in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more.

All in violation of Title 18, United States Code, Section 371.

33

## COUNT ELEVEN
Conspiracy to Commit Federal Programs Bribery
(18 U.S.C. § 371)

The Grand Jury further charges:

85.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

86.     From in or about the spring of 2020 through December 2021, in the District of Massachusetts, and elsewhere, the defendants,

MICHAEL MULLER and
JOHN COLANTUONI,

conspired with each other and with others known and unknown to the Grand Jury, to commit federal programs bribery, in violation of Title 18, United States Code, Section 666; that is, for MICHAEL MULLER, being an agent of a local government or any agency thereof, namely, the Boston Public Schools ("BPS"), which received, in each of the calendar years 2020 and 2021, benefits in excess of $10,000 under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance, and other form of federal assistance, to corruptly solicit, demand for the benefit of any person, and accept and agree to accept anything of value from JOHN COLANTUONI and COLANTUONI's Company, and for JOHN COLANTUONI to corruptly give, offer, and agree to give anything of value for the benefit of any person, with intent to influence and reward MICHAEL MULLER, in connection with any business, transaction, and series of transactions of BPS involving anything of value of $5,000 or more.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWELVE
### Conspiracy to Commit Honest Services Mail Fraud
### (18 U.S.C. § 1349)

The Grand Jury further charges:

87.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

88.     From at least as early as 2015 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

### MICHAEL MULLER,

conspired with Vendor One and with others known and unknown to the Grand Jury, to commit honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; that is, having devised and intending to devise a scheme and artifice to defraud by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive the Transportation Company and the Boston Public Schools of their right to the honest and faithful services of MICHAEL MULLER, through bribes and kickbacks, namely, a stream of benefits, including cash payments and in-kind benefits, paid to or for the benefit of MICHAEL MULLER, to knowingly cause Transportation Company checks for payment on Vendor One's invoices to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT THIRTEEN
Conspiracy to Commit Honest Services Mail Fraud
(18 U.S.C. § 1349)

The Grand Jury further charges:

89.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

90.    From at least as early as 2016 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor Two and with others known and unknown to the Grand Jury, to commit honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; that is, having devised and intending to devise a scheme and artifice to defraud by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive the Transportation Company and the Boston Public Schools of their right to the honest and faithful services of MICHAEL MULLER, through bribes and kickbacks, namely, a stream of benefits, including cash payments and one check paid to or for the benefit of MICHAEL MULLER, to knowingly cause Transportation Company checks for payment on Vendor Two's invoices to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

COUNT FOURTEEN
Conspiracy to Commit Honest Services Mail Fraud
(18 U.S.C. § 1349)

The Grand Jury further charges:

91.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this
Indictment.

92.     From at least as early as 2011 through December 2021, in the District of
Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

conspired with Vendor Three and with others known and unknown to the Grand Jury, to commit
honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346;
that is, having devised and intending to devise a scheme and artifice to defraud by means of
materially false and fraudulent pretenses, representations, and promises, and to defraud and
deprive the Transportation Company and the Boston Public Schools of their right to the honest
and faithful services of MICHAEL MULLER, through bribes and kickbacks, namely, a stream of
benefits, including cash payments paid to or for the benefit of MICHAEL MULLER, to
knowingly cause Transportation Company checks for payment on Vendor Three's invoices to be
delivered by mail and by any private and commercial interstate carrier according to the direction
thereon, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

37

## COUNT FIFTEEN
### Conspiracy to Commit Honest Services Mail Fraud
### (18 U.S.C. § 1349)

The Grand Jury further charges:

93.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

94.    From at least as early as 2010 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

### MICHAEL MULLER,

conspired with Vendor Four and with others known and unknown to the Grand Jury, to commit honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; that is, having devised and intending to devise a scheme and artifice to defraud by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive the Transportation Company and the Boston Public Schools of their right to the honest and faithful services of MICHAEL MULLER, through bribes and kickbacks, namely, a stream of benefits, including cash payments and checks paid to or for the benefit of MICHAEL MULLER, to knowingly cause Transportation Company checks for payment on Vendor Four's invoices to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT SIXTEEN
### Conspiracy to Commit Honest Services Mail Fraud
### (18 U.S.C. § 1349)

The Grand Jury further charges:

95.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

96.     From in or about the spring of 2020 through December 2021, in the District of Massachusetts, and elsewhere, the defendants,

MICHAEL MULLER and
JOHN COLANTUONI,

conspired with each other and with others known and unknown to the Grand Jury, to commit honest services mail fraud, in violation of Title 18, United States Code, Sections 1341 and 1346; that is, having devised and intending to devise a scheme and artifice to defraud by means of materially false and fraudulent pretenses, representations, and promises, and to defraud and deprive the Transportation Company and the Boston Public Schools of their right to the honest and faithful services of MICHAEL MULLER, through bribes and kickbacks, namely, a stream of benefits, including in-kind benefits paid to or for the benefit of MICHAEL MULLER, to knowingly cause Transportation Company checks for payment on JOHN COLANTUONI's Company's invoices to be delivered by mail and by any private and commercial interstate carrier according to the direction thereon, for the purpose of executing the scheme to defraud.

All in violation of Title 18, United States Code, Section 1349.

39

COUNT SEVENTEEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

97.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

98.     From at least as early as 2015 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree,

commerce and the movement of any article and commodity in commerce, by extortion, as that

term is defined in Title 18, United States Code, Section 1951; that is, by obtaining a stream of

benefits, including cash payments and in-kind benefits, not due to the defendant, from Vendor

One, with the consent of Vendor One, which consent was induced by fear of economic harm to

Vendor One.

All in violation of Title 18, United States Code, Section 1951.

COUNT EIGHTEEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

99.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this

Indictment.

100.     From at least as early as 2016 through December 2021, in the District of

Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree,

commerce and the movement of any article and commodity in commerce, by extortion, as that

term is defined in Title 18, United States Code, Section 1951; that is, by obtaining a stream of

benefits, including cash payments and one check, not due to the defendant, from Vendor Two,

with the consent of Vendor Two, which consent was induced by fear of economic harm to

Vendor Two.

All in violation of Title 18, United States Code, Section 1951.

41

COUNT NINETEEN
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

101.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

102.    From at least as early as 2011 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951; that is, by obtaining a stream of benefits, including cash payments, not due to the defendant, from Vendor Three, with the consent of Vendor Three, which consent was induced by fear of economic harm to Vendor Three.

All in violation of Title 18, United States Code, Section 1951.

## COUNT TWENTY
Extortion
(18 U.S.C. § 1951)

The Grand Jury further charges:

103.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

104.    From at least as early as 2010 through December 2021, in the District of Massachusetts, and elsewhere, the defendant,

MICHAEL MULLER,

did obstruct, delay, and affect, and attempt to obstruct, delay, and affect, in any way and degree, commerce and the movement of any article and commodity in commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951; that is, by obtaining a stream of benefits, including cash payments and checks, not due to the defendant, from Vendor Four, with the consent of Vendor Four, which consent was induced by fear of economic harm to Vendor Four.

All in violation of Title 18, United States Code, Section 1951.

COUNT TWENTY-ONE
Obstruction of Justice
(18 U.S.C. § 1503(a))

The Grand Jury further charges:

    105.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-64 of this Indictment.

    106.    On or about April 3, 2025, in the District of Massachusetts, the defendant,

JOHN COLANTUONI,

did corruptly influence, obstruct, and impede, and endeavored to influence, obstruct, and impede the due administration of justice by giving false and misleading testimony to the grand jury regarding COLANTUONI's Company's purchase of building materials for MICHAEL MULLER's vacation house in Pascoag, Rhode Island.

    All in violation of Title 18, United States Code, Section 1503(a).

## FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

1.      Upon conviction of one or more of the offenses in violation of Title 18, United

States Code, Sections 371, 666, 1349, and 1951, set forth in Counts One through Twenty, the

defendants,

MICHAEL MULLER and
JOHN COLANTUONI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which

constitutes or is derived from proceeds traceable to the offenses.

2.      If any of the property described in Paragraph 1, above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States

Code, Section 2461(c), as a result of any act or omission of the defendants --

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be divided without
         difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in Paragraph 1 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

45

A TRUE BILL

_____
FOREPERSON

_____
CHRISTINE WICHERS
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: NOVEMBER 13, 2025
Returned into the District Court by the Grand Jurors and filed.


/s/Thomas F. Quinn Jr. 11/13/2025 @ 1:45pm
_____
DEPUTY CLERK

46